Ann ERWIN, Dwight Bleke, Richard Moeller, et al., Plaintiffs–Appellees,

v.

Richard M. DALEY, Glen Carr, Kelly Welsh, et al., Defendants–Appellants.

Nos. 95–1932 to 95–1934.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1995.

Decided Aug. 8, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 18, 1996.*

* Judge Ilana Diamond Rovner took no part in this decision.

Kimberly A. Sutherland (argued), Chicago, IL, Ronald A. Bredemann, Flood & Bredemann, Des Plaines, IL, for Ann Erwin, Richard Moeller, Charles Wippo, Alexander Karas, John Wolanski, Jesse R. Acosta, Frank L. Aguinaga, Richard L. Allen, Martin A. Anderson, Lawrence C. Augustine, Jr., Gary Baranowski, Thomas J. Barnett, Anthony J. Barry, Thomas E. Becker, Ronald Bellavia, John E. Berry, Joan Biebel, Quentin C. Black, Curtis E. Blanc, Dwight L. Bleke, Robert W. Bokowski, Fred O. Bonke, Emmett A. Boyd, Patrick J. Brannigan in No. 95–1932 and John J. Deloughery, George T. Head, William Alexander, Robert Gill, Raymond Greenwood, Lawrence Johnson, Robert Keating, Steven Schwieger in No. 95–1933.

Lawrence Rosenthal (argued), Benna R. Solomon, Andrew S. Mine, Anne K. Berleman, Susan S. Sher, Office of the Corp.

Counsel, Appeals Division, Chicago, IL, for Richard M. Daley, Glen E. Carr, Kelly Welsh, Robert Joyce, Leroy Martin, Gerald Cooper, Hubert W. Holton in No. 95–1932.

Lawrence Rosenthal (argued), Benna R. Solomon, Anne K. Berleman, Susan S. Sher, Office of the Corp. Counsel, Appeals Division, Chicago, IL, for Edward Brooks in Nos. 95–1932, 95–1933, and Leroy Martin, Gerald Cooper, Hubert W. Holton, Kelly Welsh in No. 95–1933.

Patricia M. Carroll–Smit, Office of the Corp. Counsel, Chicago, IL, Lawrence Rosenthal (argued), Jay M. Kertez, Mary F. Harkenrider, Benna R. Solomon, Anne K. Berleman, Susan S. Sher, Office of the Corp. Counsel, Appeals Division, Chicago, IL, for Genn Carr in No. 95–1933.

Stephen B. Horwitz (argued), Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for William R. Reynolds, Bernard Kelly, Paul D. Lewis, John Halpin, Francis P. McCarthy, Thomas M. Whalen, Earl W. Zuelke, Jr., Harold T. Denis, Thomas J. Spanos, Vincent M. Russo, Thomas F. Keane, Michael P. Atkins, Donald F. McGuire, Dennis Banahan, Francis J. Bickham, Robert S. Dennewitz, Stephen L. Kuhn, Maurice P. Sullivan, John P. Valaitis, James Lane in No. 95–1934.

Lawrence Rosenthal (argued), Jay M. Kertez, Mary F. Harkenrider, Benna R. Solomon, Anne K. Berleman, Susan S. Sher, Office of the Corp. Counsel, Appeals Division, Chicago, IL, for Leroy Martin and Glen E. Carr in No. 95–1934.

Before BAUER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Although this case indirectly relates to the long-standing dispute about the process by which the Chicago Police Department (CPD) handled promotions in 1990, the direct question presented is whether the City officials before us were entitled to qualified immunity for the decisions they made at that time. The district court thought not, in light of the Supreme Court's decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), which im-

posed stricter requirements on "affirmative action" plans than had existed theretofore. We find, however, that the law in this area was sufficiently unsettled at that time that one cannot conclude that the City officials violated clearly established statutory or constitutional rights of which a reasonable person would have known. See *Behrens v. Pelletier,* —— U.S. ——, ——, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996). Accordingly, we reverse the district court's decision.

**I**

Because our decision turns on the state of the law rather than the particular facts of the underlying litigation, we offer here only a summary of those proceedings. The story begins with Judge Prentice Marshall's 1973 injunction against the City, requiring it to refrain from using any promotional procedure, test, or standard that had an adverse impact on the promotion of African–Americans, Latinos, or women. Over the following years, the City worked to develop tests and procedures that would implement this command. In 1984, however, Judge Marshall ruled that the City's 1977 police lieutenant's promotional examination flunked the test because it had a disparate impact on African–American officers and there was no business necessity to justify promotions made in rank order from a list based on those exam results. He ordered the City to design a new lieutenant's promotional exam, to "equalize" promotions, and to award back pay in some circumstances. This Court affirmed that ruling in *Bigby v. City of Chicago,* 766 F.2d 1053 (7th Cir.1985).

As the district court had ordered, the parties went back to the drawing board and created a new examination, which had three parts: (1) a multiple choice section, used as a preliminary screening device, (2) written short answers, and (3) an oral interview. This new exam was administered to lieutenant applicants in 1987. After reviewing the results from the first two sections of the exam, the *Bigby* parties concluded that African–American and Latino officers continued to be adversely affected. They ordered a statistical analysis, which revealed significant

variations in the candidates' scores based on the race of the officer taking the examination and the race of the rater who scored it. Based on the *Bigby* order and this analysis, the officials responsible for the test decided to standardize the scores to take into account the difference in raters and applicant race. Roughly, this meant creating a relative score for each of the two groups (minorities and whites) that took into account raw scores, means, and dispersion of scores around the means, and then plugging that relative score back into a unified list. After completing that process, the parties drew up the 1987 promotional list, which Judge Marshall approved. In 1988, the City and police officials made 116 promotions to the rank of lieutenant from the approved 1987 list.

In 1990, the City and police department officials decided to take matters several steps further. They reviewed the rank of lieutenant to find out how many minority officers were included and compared that number to the percentage of minority officers in the rank below (sergeant), which was the group eligible for promotion. Again, the review showed that there was a statistically significant disparity between the two groups (*i.e.* fewer minority lieutenants than the sergeant numbers would suggest). The City officials decided to address the matter by making promotions out of rank order, with a goal of making minority promotions at a rate of 20 percent over the percentage of minority officers eligible for promotion. In 1990, using this system, 32 sergeants were promoted in rank order to the rank of lieutenant, and four were promoted out of rank order. After a similar analysis, the City officials decided to take the same approach to promotions from lieutenant to captain. They made 19 promotions to captain, of which 16 were in rank order and three were out of rank order.

## II

The City's efforts to increase minority representation among the lieutenant and captain ranks led in 1990 to lawsuits by three groups of plaintiffs, each alleging that the civil rights of white candidates for promotion had been violated by the various measures described here. The plaintiffs brought suit pursuant to

42 U.S.C. §§ 1981, 1983, 1985(3) and 1986 alleging violations of the Equal Protection and Due Process Clauses of the 14th Amendment, as well as various state laws. In *Erwin v. City of Chicago*, the plaintiffs included approximately 220 sergeants who took the 1987 police lieutenant examination. In *Deloughery v. City of Chicago*, the plaintiffs were white lieutenants who took the 1987 police captain examination. In *Reynolds v. City of Chicago*, the plaintiffs were a separate group of white sergeants and lieutenants who took the 1987 police lieutenant and captain examinations. All three plaintiff groups brought suit against the City and various officials. On January 31, 1991, the district court consolidated the three cases for purposes of pre-trial proceedings.

The defendants raised the defense of qualified immunity by motion in both *Erwin* and *Deloughery*, but by an order of July 3, 1991, the district court rejected it on the theory that it was not ripe for decision. The court dismissed all claims in *Erwin* except for the plaintiffs' equal protection theory, under 42 U.S.C. § 1983, and it dismissed the state law claim in *Deloughery*, again allowing the equal protection claim to stand against the defendants in their individual capacities. On July 7, 1994, the officials who were sued individually in *Erwin*, *Deloughery*, and *Reynolds* filed a motion for summary judgment, once again raising the qualified immunity defense. The district court granted the motion with regard to all three cases on August 10, 1994, but the officials' victory was short-lived with respect to the 1990 promotions. On November 28, 1994, in response to the plaintiffs' motion to reconsider, the district court vacated its August 10th order. On January 23, 1995 the court issued an opinion granting summary judgment on qualified immunity grounds for the defendants with respect to the 1988 promotions and denying summary judgment for the 1990 promotions.

The key difference between the two, the court reasoned, was the Supreme Court's 1989 decision in *Croson*. The judge concluded that the record did not contain "enough factual evidence for us to independently determine that [the City officials] complied with *Croson* to be entitled to qualified immunity."

On March 21, 1995, the court denied the defendants' motion to reconsider. This appeal followed, on behalf of Mayor Richard M. Daley, Glenn Carr (Commissioner of the City Department of Personnel), Robert Joyce (Deputy Commissioner of the Department of Personnel), LeRoy Martin (former Superintendent of the CPD), Gerald Cooper (former Executive Assistant and General Counsel to the Superintendent of the CPD), Edward Brooks (former Deputy Superintendent of the CPD), Hubert Holton (former Commander of the CPD's Personnel Division), and Kelly Welsh (former Corporation Counsel).

### III

 The Supreme Court has long held that public officials are entitled to some form of immunity from suits for damages. See *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896); *Scheuer v. Rhodes*, 416 U.S. 232, 247, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974); *Harlow v. Fitzgerald*, 457 U.S. 800, 806–07, 102 S.Ct. 2727, 2731–32, 73 L.Ed.2d 396 (1982). This necessarily means that, within the area of immunity, the officials do not have to undergo the burden of litigation; they do not need to prove that they were "right" in order to enjoy the defense. To the contrary, qualified immunity shields government officials who are performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1438–1439 (7th Cir.1994). The inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). It is an objective test, as the Supreme Court recently reiterated, "precisely in order to permit the defeat of insubstantial claims without resort to trial." *Behrens*, —— U.S. at ——, 116 S.Ct. at 838 (internal quotations omitted).

 Once a public official raises the defense of qualified immunity, the plaintiff bears the burden of proof on the issue.

*Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir.1996); *Gregorich v. Lund*, 54 F.3d 410, 413 (7th Cir.1995); *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). When considering a defense of qualified immunity, two questions are pertinent: first, whether the plaintiff has asserted a violation of a constitutional right at all, and second, whether the plaintiff has demonstrated that the applicable constitutional standards were clearly established at the time in question. See *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir.1995); *Zorzi v. County of Putnam*, 30 F.3d 885, 892 (7th Cir.1994). The key point for the second question is whether a reasonable person would have been on notice that her actions violated clearly established law. A plaintiff can establish this either by showing that a closely analogous case has already established both the right at issue and its application to the factual situation at hand, see *McGrath v. Gillis*, 44 F.3d 567, 570 (7th Cir.1995), or by showing that the violation was so obvious that a reasonable person would necessarily have known about it. See *Clash*, 77 F.3d at 1048; *Rakovich*, 850 F.2d at 1214.

The first question, whether the police officer plaintiffs have alleged a denial of a constitutional right, is one that can be answered readily. Their complaints asserted that the City's use of a race-standardized promotion examination and their practice of making limited promotions out of rank order violated the Equal Protection Clause of the United States Constitution. As the Supreme Court implied in *Siegert, supra*, we apply the standard of Rule 12(b)(6) to the sufficiency of the allegations of a violation of a constitutional right in answering this question. (In *Siegert*, the Court concluded that Siegert's allegations, "even if accepted as true, did not state a claim for violation of any rights secured to him under the United States Constitution." 500 U.S. at 227, 111 S.Ct. at 1791. See also *id.* at 233–34, 111 S.Ct. at 1793–94.) Here, under the standards of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), *Leatherman v. Tarrant County*

*Narcotics Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), and *Palmer v. Board of Education of Community Unit School District 201–U, Will County, Illinois,* 46 F.3d 682, 688 (7th Cir.1995), the plaintiffs alleged facts that stated a claim for purposes of § 1983 and the Constitution. Under these circumstances, we must go on to the second part of the immunity inquiry, because a determination whether the plan actually violated the Constitution would involve the very kind of extended procedures that the qualified immunity defense is designed to spare the defendants. See *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793.

■ The second question is whether it was clearly established in 1990 that, in the light of a prior judicial finding of discrimination, the use of numerical promotional goals for the promotion of minority police officers and the use of racially standardized test results violated the Equal Protection Clause of the 14th Amendment. The district court thought so, in light of the Supreme Court's decision in *Croson.* With respect, we disagree. We begin by reviewing *Croson* itself, and then we look to decisions from the Supreme Court and the lower courts after *Croson* to see what was and was not "clearly established" in its wake.

The question in *Croson* dealt with the constitutionality of the City of Richmond's plan requiring prime contractors to whom the city awarded construction contracts to subcontract at least 30 percent of the dollar amount to one or more minority business enterprises. This was not a new subject for the Court, as Justice O'Connor's opinion for the majority in Part I noted. The earlier decisions in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), and *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), although they addressed different kinds of minority set-aside programs, had not resolved the questions in the lower courts about the proper treatment and standard of review for all such programs. In the end, the Court concluded that it was difficult to tell whether the Richmond plan was narrowly tailored to remedy prior discrimination. *Croson,* 488 U.S. at 507, 109 S.Ct. at 729.

There did not "appear to have been any consideration of the use of race-neutral means to increase minority business participation in city contracting," and the 30 percent quota was not "narrowly tailored to any goal, except perhaps outright racial balancing." *Id.*

A four-person plurality of the Court concluded with the statement that "[n]othing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction." *Id.* at 509, 109 S.Ct. at 729. (O'Connor, J., with Rehnquist, C.J., and White and Kennedy, JJ.) Three other members of the Court would have upheld the plan in its entirety. See *id.* at 528, 109 S.Ct. at 740 (dissenting opinion of Marshall, J., joined by Brennan and Blackmun, JJ.) and 561, 109 S.Ct. at 757 (dissenting opinion of Blackmun, J., joined by Brennan, J.). Justice Stevens disagreed with the basic premise that "a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong," *id.* at 511, 109 S.Ct. at 711, although he agreed that the Richmond plan could not be justified as such a remedy. Only Justice Scalia expressly disagreed with the proposition that state and local governments could, in his words, "in some circumstances discriminate on the basis of race in order (in a broad sense) 'to ameliorate the effects of past discrimination.' " *Id.* at 520, 109 S.Ct. at 736.

One important indicium of how well established the law was in 1990, after *Croson,* is the way the courts handled analogous litigation. In the event, the lower courts after *Croson* did not find the lead opinion (which contained sections that spoke for the Court and other sections speaking only for varying pluralities), nor any of the other five published opinions, crystal clear. As a result, the Supreme Court itself returned to the subject in 1995, in *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Once again, the case gave rise to multiple opinions and a complex road-map for determining exactly what was the opinion of the Court and what reflected plurality views. See *id.* at ——, 115 S.Ct. at 2101. Justice O'Connor's opinion in *Ada-*

*rand* notes that a majority of the Court had agreed in *Croson* that the Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments. *Id.* at ——, 115 S.Ct. at 2110. It notes, however, that only one year after *Croson,* the Court held, in *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), that the minority preference policies of the Federal Communications Commission did not violate equal protection principles. *Adarand,* —— U.S. at ——, 115 S.Ct. at 2111–2112. *Adarand* repudiated the *Metro Broadcasting* holding that intermediate scrutiny was the appropriate standard of review for "benign" racial classifications and held that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Id.* at ——, 115 S.Ct. at 2113.

The *Adarand* Court was careful to distinguish between the type of scrutiny to which racially based programs are subject and the ultimate outcome of any inquiry. Justice O'Connor wrote that "we wish to dispel the notion that strict scrutiny is strict in theory, but fatal in fact." *Id.* at ——, 115 S.Ct. at 2117 (internal quotations omitted). She continued:

> The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it. As recently as 1987, for example, every Justice of this Court agreed that the Alabama Department of Public Safety's "pervasive, systematic, and obstinate discriminatory conduct" justified a narrowly tailored race-based remedy. See *United States v. Paradise,* 480 U.S., at 167, 107 S.Ct., at 1064 (plurality opinion of Brennan, J.); *id.,* at 190, 107 S.Ct., at 1076 (Stevens, J., concurring in judgment); *id.,* at 196, 107 S.Ct., at 1079–80 (O'Connor, J., dissenting). When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the "narrow tailoring"

test this Court has set out in previous cases.

—— U.S. at ——, 115 S.Ct. at 2117.

*United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), which the Court cited with approval in the passage quoted above from *Adarand,* involved exactly the same kind of remedial measure that the Chicago Police Department used here. In *Paradise,* there had been a prior judicial finding that the Alabama Department of Public Safety had systematically excluded African–Americans from employment in violation of the Fourteenth Amendment. Eleven years after that finding, the district court ordered the Department to use out of rank order promotions, as long as qualified African–American candidates were available, until the Department implemented an acceptable promotion procedure. That plan was even stricter than the one at issue in the present case, since it required a one-African-American-for-one-white promotion system. The judgment of the Court upheld the plan, even though the rationales of individual Justices voting for that result varied.

The lower courts, in light of the Supreme Court decisions over the years, have upheld a number of race-based programs similar to the one adopted by the CPD here. Several courts of appeals, post-*Croson,* have upheld the use of out of rank order promotions as a remedy in the face of a statistical disparity and a showing of past discrimination. See *Donaghy v. City of Omaha,* 933 F.2d 1448, 1460 (8th Cir.1991); *Stuart v. Roache,* 951 F.2d 446, 448–49, 455 (1st Cir.1991); *Davis v. City and County of San Francisco,* 890 F.2d 1438, 1446–48 (9th Cir.1989); *Edwards v. City of Houston,* 37 F.3d 1097, 1102–03, 1115 (5th Cir.1994), *vacated and remanded,* 78 F.3d 983 (5th Cir.1996) (5th Circuit vacated consent decree after reversing district court's denial of several motions to intervene in underlying case). Courts have also held that a compelling state interest can be demonstrated by the use of statistical evidence of present discrimination plus a history of entry-level and promotional discrimination. See *Stuart v. Roache, supra; Vogel v. City of Cincinnati,* 959 F.2d 594, 596–97, 601 (6th Cir.1992) (statistical evidence alone could

prove a compelling state interest that underlies a permissible affirmative action plan). A number of courts have found that the specific remedy of out of rank order promotions is "narrowly tailored." *Edwards v. City of Houston,* 37 F.3d at 1115; *Vogel v. City of Cincinnati,* 959 F.2d at 601; *Stuart v. Roache,* 951 F.2d at 455.

Finally, this Court's recent decision in *Wittmer v. Peters,* 87 F.3d 916 (7th Cir.1996), underscores the complexity of the decisions facing public officials in this area. In *Wittmer,* the question was whether the State of Illinois could make racially based out of rank order promotions to the rank of lieutenant in a minimum security "boot camp" for nonviolent male criminals between the ages of 17 and 35. In the exceptional context of these "boot camps," the Court concluded that the State satisfied the demanding standard of justification established by *Adarand* to support its decision that at least some African–Americans needed to be in positions of authority for the program to succeed. In so holding, the Court also made clear that "rectification of past discrimination is not the only setting in which government officials can lawfully take race into account in making decisions." *Id.* at 919.

Whatever else one might say about the state of the law in 1990 on affirmative action programs, the standard of review to which they are subject, and the nature of the justifications that will support them, it is clear that as of the time the City officials implemented their promotion program it was not "clearly established" within the meaning of *Harlow, Siegert,* and *Rakovich* that the use of standardization techniques and out of rank order promotions in police departments was illegal. Indeed, it may not be illegal at all. It is possible that the 1990 promotion procedures challenged in the underlying litigation will pass the current legal tests, or they may not. The litigation against the City itself is still before the district court, and the police officers will have an opportunity to make their case there. The City officials before us in this appeal, however, are entitled to qualified immunity from suit.

We therefore REVERSE the decision of the district court and REMAND for the dismissal of the City officials.