James A. McNAMARA, John J. Sullivan, Thomas R. Miller, Charles W. Lux, William T. King, Charles E. Dineen, Richard A. Graf, Henry T. Scavone and Paul B. Sobczak, Plaintiffs,

v.

CITY OF CHICAGO, a municipal corporation, Defendant.

No. 93 C 1098.

United States District Court,
N.D. Illinois,
Eastern Division.

March 18, 1997.

Kimberly Sutherland, Chicago, IL, for Plaintiffs.

Susan S. Sher, Corporation Counsel, Shona Glink, Asst. Corporation Counsel, Jay Ker-

tez, Asst. Corporation Counsel, City of Chicago, Chicago, IL, for Defendant.

## DECISION ON THE MERITS

CONLON, District Judge.

The hiring and promotional practices of the Chicago Fire Department have spawned more than two decades of civil rights litigation. In this case, nine white captains and lieutenants challenge the affirmative action promotion of sixteen black and nine Hispanic lieutenants to the position of captain. The plaintiffs claim their equal protection rights under the United States Constitution were violated by the challenged promotions.

A six-day bench trial was held. After considering the testimony, exhibits and arguments of counsel, the court enters the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

As a preliminary matter, the court adopts and incorporates the parties' stipulation of uncontested facts, as well as the now uncontested portions of the city's statement of contested facts in the joint final pretrial order.

## THE 1987 CAPTAIN'S EXAMINATION

The following background facts are undisputed. The City of Chicago's Department of Personnel develops and administers promotional examinations for the Chicago Fire Department. Plaintiffs challenge the out of rank order promotions of twenty-five blacks and Hispanics on May 1, 1991 and April 1, 1992 from the results of fire captain examination # 68737. Plaintiffs are white males who passed the fire captain examination.

Only lieutenants in the Chicago Fire Department were eligible to take the captain's examination. The examination consisted of three parts: a written multiple choice test, an oral board interview and credit for seniority. The city's Department of Personnel used job content as a source of knowledge and skill to be tested. To define job content for the 1987 captain's examination, the Department of Personnel conducted a job analysis. The process used is detailed in "The Report on the Validation of the Fire Captain Examination of 1986." It is undisputed that the job analysis procedures used by the city in the construction of the 1987 captain's examination were professionally recognized and complied with the Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures.

After the job analysis was conducted, the tasks, knowledge, skills and abilities identified, and the source materials examined, a joint committee from the Chicago Fire Department and the Department of Personnel prepared the test.

Training sessions were conducted at city colleges prior to the administration of the examination. The Chicago Fire Department provided each applicant with source materials to study. These materials included fire department rules and regulations, citations to general orders, operating procedures, and bulletins.

The oral component of the examination was designed to measure and evaluate knowledge, skills and abilities that are important to the position of fire captain. The oral examination questions were also developed by a joint committee of Chicago Fire Department and Department of Personnel staff. The nine oral board raters who graded the oral examinations were commanders in the Chicago Fire Department; each candidate was evaluated by two of these commanders.

A total of 577 lieutenants applied to take the 1987 captain's examination: 496 were white (86%), sixty-three (10.9%) were black, and eighteen (3.1%) were Hispanic. A total of 543 lieutenants actually took the written component of the examination: 463 (85.3%) were white, sixty-three (11.6%) were black, and seventeen (3.1%) were Hispanic. Only 506 lieutenants then proceeded to take the oral component of the examination: 431 (85.2%) were white, fifty-eight (11.5%) were black, and seventeen (3.4%) were Hispanic.

The results of the 1987 captain's examination were weighted 65% on the written component, 25% on the oral component and 10% on seniority. The passing score was 70; 341 of the candidates passed the examination.

A promotional eligibility list of the 341 lieutenants who passed the examination

ranked the candidates in the order of their test results. Between October 16, 1987 and April 1, 1992, 161 lieutenants from the promotional eligibility list were promoted to captain: 121 were white, thirty-one were black, and nine were Hispanic. Of these 161 promotions, twenty-five were made on a non-rank order basis. Of the twenty-five non-rank promotions, sixteen were to black lieutenants and nine were to Hispanic lieutenants. Eligible candidates ranked 106, 115, 132, 162 and 165 waived promotion or were withdrawn for reasons unrelated to this case. It is undisputed that if promotions from the 1987 eligibility list had been made in strict rank order, all candidates ranked up to and including rank 146 would have been promoted.

Plaintiffs declined to stipulate that twelve promotions were made in 1992 to comply with the city's "wrap-around" agreement with the United States Department of Justice pursuant to a settlement agreement in another civil rights case. This group also included three additional minority out of rank promotions. However, the undisputed evidence established that promotions were given to all non-minority lieutenants who were passed over because of out of rank order affirmative action promotions. *See, e.g.*, Def.Ex. 8, 9. Plaintiffs ranked as follows on the promotional eligibility list: James A. McNamara 152; John J. Sullivan 153; Thomas R. Miller 154; Charles W. Lux 157; William T. King 159; Charles E. Dineen 166; Richard A. Graf 136; Henry A. Scavone 138; and Paul B. Sobczak 139. Plaintiffs Graf, Scavone and Sobczak were each promoted to the rank of captain before the list expired, pursuant to the "wrap-around" agreement. The remaining plaintiffs were not promoted from the eligibility list, which expired shortly after April 1, 1992. *Id.*

## STANDING

■ The city belatedly challenges the standing of plaintiffs McNamara, Sullivan, Miller, Lux, King and Dineen, all of whom ranked lower than 146 on the promotional eligibility list.[1] Because these plaintiffs would not have been promoted even if strict rank order had been followed, the city argues that they have failed to show any injury from the non-rank affirmative action promotions.

It is plaintiffs' burden to establish all elements of their claim under 42 U.S.C. § 1983 by a preponderance of the evidence. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277–78, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986). This includes the necessity of showing that plaintiffs have actually suffered a particularized and specific injury as a result of the city's conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Plaintiffs have not done so. Rather, they respond that simply because there were a total of 161 promotions from the eligibility list and they ranked numerically higher than 161, they should have been promoted. However, plaintiffs ignore the undisputed fact that if strict rank order had been followed, no candidate ranked lower than 146 would have been promoted. In fact, all non-minority candidates passed over due to out of rank affirmative action appointments were in fact promoted under the "wrap-around" agreement (including the three remaining plaintiffs: Graf, Scavone and Sobczak). Accordingly, plaintiffs McNamara, Sullivan, Miller, Lux, King and Dineen were not denied promotions because of the out of rank affirmative action promotions, and lack standing in this case. Thus, the only question here is whether the delay in promoting Graf, Scavone and Sobczak constitutes a violation of the Equal Protection Clause.

## CONSTITUTIONALITY OF AFFIRMATIVE ACTION

It is a fundamental principle that the Equal Protection Clause of the United States Constitution prohibits municipalities from discriminating on the basis of race or ethnicity. Plaintiffs contend that the twenty-five out of rank affirmative action promotions discriminated against them based upon the fact that plaintiffs are white.

■ To pass constitutional muster, race-based affirmative action must be strictly

---

**1.** It is unfortunate that the city did not raise this issue in a motion for summary judgment, as it would have narrowed the issues for trial and obviated the affected plaintiffs' inconvenience and burden in participating in this trial.

scrutinized to determine whether it serves a compelling governmental interest and whether it is narrowly tailored to further that governmental interest. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, ———–——, 115 S.Ct. 2097, 2116–17, 132 L.Ed.2d 158 (1995). Racial and ethnic distinctions are inherently suspect and therefore require the most exacting judicial examination. *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2748–49, 57 L.Ed.2d 750 (1978). However, municipalities are not constitutionally barred from taking race-based affirmative action when it is necessary to remedy the lingering effects of discrimination against minority groups. *Adarand,* 515 U.S. at ———, 115 S.Ct. at 2117. As Justice O'Connor wrote in *Adarand,*

> Finally, we wish to dispel the notion that strict scrutiny is "strict in theory, but fatal in fact." *Fullilove [v. Klutznick], supra,* [448 U.S. 448] at 519, 100 S.Ct., [2758] at 2795 [65 L.Ed.2d 902 (1980)] (Marshall, J., concurring in judgment). The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it. As recently as 1987, for example, every Justice of this Court agreed that the Alabama Department of Public Safety's "pervasive, systematic, and obstinate discriminatory conduct" justified a narrowly tailored race-based remedy. *See United States v. Paradise,* 480 U.S., [149] at 167, 107 S.Ct., [1053] at 1064 [94 L.Ed.2d 203 (1987)] (plurality opinion of BRENNAN, J.) *id.,* at 190, 107 S.Ct., at 1076 (STEVENS, J., concurring in judgment); *id.,* at 196, 107 S.Ct., at 1079–1080 (O'CONNOR, J., dissenting). When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the "narrow tailoring" test this Court has set out in previous cases.

*Id.*

### COMPELLING GOVERNMENTAL INTEREST

■ A compelling governmental interest justifying affirmative action may be shown by the use of statistical evidence establishing discrimination plus a history of entry-level and promotional discrimination. *Erwin v. Daley,* 92 F.3d 521, 527 (7th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). *Stuart v. Roache,* 951 F.2d 446, 448–49, 455 (1st Cir.1991); *Vogel v. City of Cincinnati,* 959 F.2d 594, 596–97, 601 (6th Cir.1992) (statistical evidence alone sufficient to show compelling governmental interest). The statistical and historic evidence presented by the city establishes that the Chicago Fire Department has openly and intentionally discriminated against blacks and Hispanics until at least 1979; decades of discrimination have caused a significant lingering overrepresentation of whites and a significant underrepresentation of blacks and Hispanics, particularly in the upper ranks, when the promotions were made from the 1987 captain's examination.

■ The Department of Personnel predicated its decision to make a limited number of out of rank affirmative action promotions on three independent grounds. Def.Ex. 6. First, the city was under a continuing obligation to comply with a 1980 consent decree entered by former Judge McGarr of this Court in a desegregation case brought by the United States Department of Justice. The decree required the city to pursue a goal of promoting blacks and Hispanics to substantially increase minorities at each promotional rank; each rank was to become more representative of the rank from which promotions were made. In July 1987, only 3% of the captains were black or Hispanic, while 13.5% of the lieutenants and 26% of the firefighters/engineers were black or Hispanic. The city's Corporation Counsel was of the opinion that under these circumstances, adherence to strict rank order promotions would violate Judge McGarr's decree. *Id.* at 1.

Second, under an existing collective bargaining agreement, the city was required to follow promotion policies designed to achieve a level of representation at each rank as close as reasonably possible to 45% black and Hispanic, as quickly as possible. *Id.* at 1–2.

Third, wholly apart from Judge McGarr's decree and the collective bargaining agreement, Commissioner of Personnel Jesse E. Hoskins concluded that the city's commitment to equal opportunity required adoption of reasonable affirmative action measures to remedy the effects of past discrimination. In his letter to Fire Commissioner Louis Galante explaining the city's decision, Commissioner Hoskins observed:

> Although we have been working in recent years to overcome the effects of past discrimination, those effects are still clearly present. Based on 1980 census workforce availability figures, one would expect Blacks and Hispanics to comprise approximately 35% and 10% respectively, of each rank in the promotional sequence. The actual utilization figures demonstrate a sever under-utilization.
>
> \* \* \* \* \* \*
>
> | | | |
> |---|---|---|
> | Lieutenants | 10.4% | 3.1% |
> | Captains | 2.1% | 1.03% |
> | Battalion Chiefs | 1.01% | 1.01% |
>
> The unfortunate reason for this underutilization is past discrimination by the City. Prior to the late 1970's, there was only minimal hiring of Blacks and Hispanics as Firefighters [the entry level position]. The discrimination in hiring has had its predictable effect on minority access to higher level positions ... This problem was exacerbated by the past use of discriminatory promotion tests, *i.e.*, invalidated tests which had an adverse impact on minorities. These practices led the United States Department of Justice to bring suit against the City, which produced the consent decrees under which we now operate.

*Id.* at 2. The evidence adduced at trial fully supports Commissioner Hoskin's analysis.

It is undisputed that prior to September 1965, the Chicago Fire Department maintained racially segregated firehouses and companies. The uncontroverted evidence establishes that Commissioner Robert J. Quinn of the Chicago Fire Department ordered limited, token integration of certain firehouses only after widespread rioting on the westside in August 1965. The rioting occurred after the death of Dessie Mae Williams, a twenty-three year old black woman who was reportedly killed due to the negligence of white firefighters from an all-white firehouse located in a predominately black westside neighborhood.

Credible trial testimony established pervasive, intentional discrimination experienced by black applicants and firefighters since at least the 1950's. Many of the witnesses observed that black applicants were frequently disqualified during medical examinations for the stated reason of "flat feet" or "heart murmurs," which blacks viewed as pretextual. Only a few blacks were hired and sent to the fire department's training academy in classes that varied from seventy to over a hundred whites. According to unchallenged testimony, there were never more than 205 black firefighters (out of several thousand firefighters) at any time prior to 1977. The very small number of black firefighters remained relatively fixed between 1950 and 1977, despite the steady increase in minority population during that period. Def.Ex. 63, ex. 4. The observed disparities between blacks in the Chicago Fire Department and blacks in the qualified and interested work pool greatly exceed two to three standard deviations and thus strongly suggest intentional discrimination. *Associated General Contractors of California, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1414 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); *Waisome v. Port Authority of New York and New Jersey,* 948 F.2d 1370, 1376 (2d Cir.1991).

Entry-level black firefighters were then assigned to all-black companies or trucks usually under the direction of white officers who spent little time in the black firehouses. White firefighters were only assigned to black firehouses as punishment for disciplinary infractions. Black firehouses were situated in high frequency areas for fire calls, and were called upon to fight some of the most deadly fires. Nevertheless, the equipment furnished to black firefighters was generally older than that furnished to white firefighters called to assist at the same fires. Black firefighters who complained about working conditions were subject to retaliation and punishment. This was graphically illustrated by the experiences of the wit-

nesses who attempted to route their complaints through proper channels.

Most of the minority witnesses personally experienced racially demeaning comments and conduct from white personnel of the fire department, from former Commissioner Robert J. Quinn (1957–1978) to officers and other firefighters. The record reflects persuasive evidence of racial animus and hostility by the leadership, as well as the rank and file of the fire department, during Commissioner Quinn's administration.

Requests for transfer by black firefighters to firehouses closer to their homes were routinely denied. According to the persuasive testimony of former Fire Commissioner Louis Galante (1983–1989) and Deputy Personnel Commissioner Thomas T. Joyce, blacks fared poorly on evaluations because of the use of subjective efficiency ratings; blacks generally scored far below whites when rated for "efficiency" by white officers. This perception of unfairness was also common among black firefighters who testified at trial.

No training or preparatory materials were given applicants for promotional examinations. Before affirmative action orders in several previous civil rights cases, few blacks or Hispanics reached the top ranks of battalion chief and chief. Indeed, according to uncontradicted testimony, a black would not be promoted to these upper ranks unless another black vacated the position. Prior to 1974, there were only seven black battalion chiefs in the entire history of the fire department. Prior to the mid or late 1980's, there were never more than two black battalion chiefs at one time. Affirmative action prior to 1987 had a minimal impact on the observed racial disparities in the rank of captain. Relatively few blacks were promoted from entry-level firefighter to the position of lieutenant until the late 1970's. The length of time it has taken for blacks to be promoted from firefighter to lieutenant has been significantly longer than that for whites. This was shown by reliable statistical evidence for the period 1973 to 1993 and by the actual experiences of the witnesses, who were consistently denied the opportunity to "act up" to officers' positions when a vacancy

occurred. Blacks were thereby denied meaningful experience for advancement.

The presence of Hispanics was rare; there were less than twenty on the job in 1974. Former Fire Commissioner Raymond Orozco (1989–1996), who held the rank of captain in 1974, was the highest ranking Hispanic in the fire department at that time. One of the witnesses with an Hispanic name, Francesco de la Cerna, was told by a fire department officer that the department did not hire Mexicans and Puerto Ricans when he applied in the 1950's. The minimum height restriction prior to 1974, which the parties stipulate was not related to the job, evidences purposeful discrimination when viewed in the context of all the other evidence. *Dothard v. Rawlinson*, 433 U.S. 321, 328–30, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977).

Compelling and credible evidence establishes systemic discrimination existed in the Chicago Fire Department for decades. Open discriminatory practices pervaded all levels within the fire department until at least the late 1970's. Integration was only permitted to a limited degree under public pressure, such as the 1965 westside riots or to showcase a special unit with high public visibility. In order to evade a 50% minority hiring order effective for four years in a consent decree issued by another judge of this Court, the fire department simply froze hiring from 1974 to 1979. Def.Ex. 86–90. The evidence showed that the hiring freeze was contrary to the fire department's needs and the public safety. A reasonable inference may be drawn that the management of the fire department under Commissioner Quinn considered the defeat of court-ordered integration far more important than the efficient functioning of a vital public service. As the result of years of discrimination and the 1977–1979 hiring freeze, blacks and Hispanics were substantially underrepresented in the lieutenant pool qualified for promotion to the rank of captain in the late 1980's.

In sum, the evidence supports the city's 1987 decision to utilize limited out of rank promotions to ameliorate the significant underrepresentation of minorities in the rank of captain. Based upon strong evidence of the lingering effects of purposeful discrimination

over a long period time, the city had a compelling governmental interest in addressing the problem.

### A NARROWLY TAILORED REMEDY

■ In deciding to employ out of rank promotions for the 1987 captain's test, the city expressly found that there were no other available means to accelerate the progress of significantly underrepresented minorities through the promotional ranks of the Chicago Fire Department. The city used race-neutral means to provide training and study materials for the 1987 captain's examination. The city sought a remedy that would not unduly burden non-minority candidates for promotion or result in the promotion of unqualified minorities. In his letter to Fire Commissioner Galante, the city's Director of Personnel stated:

> In view of the current 97% white composition of the rank of Captain, an argument could be made for the temporary use of a 50% minority promotion ratio. Although we considered selecting a 50% ratio, the lower goals of 20% Black and 5% Hispanic were chosen in order to ensure that our affirmative action efforts do not unduly burden other candidates for promotion.

> We also considered the qualifications of the individuals who will be promoted as a result of the affirmative action goals. First and foremost, **no one will be promoted as a result of affirmative action unless that person has been shown to be qualified by virtue of achieving a passing score on the [1987 captain's examination]....** [E]xamination of the rank order test scores shows that there will be virtually no difference in test scores between those promoted as a result of affirmative action and those who would have been promoted were we to promote in strict rank order.

Def.Ex. 6 at 4 [emphasis added]. The affirmative action promotions were limited to the three-year life of the promotional eligibility list or until 150 promotions were made from the list. *Id.* The goals of the temporary plan were to be evaluated annually; the plan was designed to remove the effects of past discrimination, not to maintain racial balance after the effects of past discrimination were corrected. *Id.* And because of the "wraparound" agreement with the Justice Department, all non-minority lieutenants who were by-passed for promotion because of affirmative action promotions were in fact also promoted before the eligibility list expired in 1992. Def.Ex. 9. Thus, the impact on third parties was minimized.

The burden on the three remaining plaintiffs was a delay of one year in their promotions. This delay was unfortunate for plaintiffs. However, the court cannot conclude that this delay was unreasonable or unduly burdensome under all the circumstances. The earlier out of rank promotions of twenty-five fully qualified blacks and Hispanics were not a violation of plaintiffs' constitutional right to the equal protection of the law. *United States v. Paradise,* 480 U.S. 149, 183, 107 S.Ct. 1053, 1072–73, 94 L.Ed.2d 203 (1987).

### CONCLUSION

Plaintiffs have failed to provide any evidence that the city has engaged in unlawful race-based discrimination against whites. overwhelming credible evidence establishes that the Chicago Fire Department engaged in intentional discrimination against minorities over several decades. A limited number of out of rank promotions to fully qualified candidates was a modest remedy for this unlawful conduct.

For the foregoing reasons, judgment is entered for the defendant City of Chicago and against plaintiffs James A. McNamara, John J. Sullivan, Thomas R. Miller, Charles W. Lux, William T. King, Charles E. Dineen, Richard A. Graf, Henry A. Scavone and Paul B. Sobczak.