In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1920

SCOTT ELWELL,

Plaintiff-Appellant,

v.

KENNETH P. DOBUCKI,

Defendant-Appellee.

Appeal from the United States District Court
for the Central District of Illinois, Springfield Division.
No. 93-3068--Richard Mills, Judge.

Argued February 8, 2000--Decided August 10, 2000

Before Cudahy, Manion, and Diane P. Wood, Circuit
Judges.

Diane P. Wood, Circuit Judge.  In late 1991,
Kenneth Dobucki, the warden at Graham
Correctional Center (a medium security prison run
by the state of Illinois), was assigned the task
of hiring three new lieutenants for Graham.
Eighteen employees applied for those three
vacancies, 15 of whom worked at Graham and three
of whom were employed at other facilities
operated by the Illinois Department of
Corrections (DOC). This case was brought by one
of the disappointed applicants, Scott Elwell, who
believed that either prohibited political
favoritism or race discrimination explained why
he had been unsuccessful. The district court
granted Warden Dobucki's motion for summary
judgment on grounds of qualified immunity for the
equal protection claim and on the merits for the
political affiliation claim. Elwell appealed only
from the adverse judgment on the equal protection
claim based on qualified immunity. We affirm.

Our account of the facts would normally take
them in the light most favorable to Elwell, as
the nonmoving party, but here again we have a
case in which the nonmovant chose not to contest
the moving party's statement of undisputed facts,
filed here under Local Rule 7.1(D)(1) of the
Central District of Illinois. We therefore accept
those facts as uncontested, as did the district

court.

Warden Dobucki went about filling the three 1991 vacancies, as he was required to do under pertinent Illinois DOC rules, by posting a notice state-wide. Of the 24 applicants who initially came forward, Dobucki found that 18 were eligible for the lieutenant position. These 18 were interviewed in January 1992 by a three-person team from Graham (not including Dobucki himself). Based on those interviews and other information in the file, Assistant Warden Michael Baker prepared a memorandum for Dobucki ranking the candidates. He submitted the memorandum to Warden Dobucki at the end of January. The top five were (1) Charlotte Crockran, a black woman who held another job at Graham; (2) Theodore Macon, an African-American man who worked at another correctional center; (3) Ron Krueger, a white man who worked at another correctional center; (4) James Cohan, a white man who held another job at Graham; and (5) Elwell, who is white and who held another job at Graham. In June of 1992, Dobucki selected Crockran, Macon, and Cohan for the positions.

Elwell was upset by being passed over for the promotion and filed a 42 U.S.C. sec. 1983 complaint. His initial complaint alleged that Dobucki denied him the promotion because of his political affiliations, in violation of the First Amendment. In 1994 he amended the complaint to add the charge that he was passed over because he was white, in violation of the Equal Protection Clause. This latter claim rested on Elwell's belief that Dobucki had a policy of hiring in-house (i.e. applicants presently working at Graham). Had Dobucki followed that policy, he would have still chosen Crockran and Cohan, but Elwell would have replaced Macon as the third choice. According to Elwell, Dobucki veered from his normal hiring policy, passing over Elwell and hiring Macon, because he wanted more African-American lieutenants. Evidence in the record showed that as of February 1992 (before the hiring decision in June 1992), only four of the 25 lieutenants working at Graham were African-American. The record further showed that as of the same time, there were 1,269 inmates at Graham, 46% of whom were African-American. The security staff included one major, six captains, the 25 lieutenants, 22 sergeants, and 259 correctional officers; 16 of those individuals, or 3.6%, were African-American.

The district court granted Dobucki's motion for summary judgment on the First Amendment count in October 1994. Years later, in March of 1998, it agreed that he had qualified immunity on the equal protection count and it therefore granted

his motion for summary judgment on that theory as well. We review the grant of summary judgment de novo, examining the record (including its lack of uncontested facts) in the light most favorable to Elwell to see if he has shown any genuine issue of material fact. See Bahl v. Royal Indem. Co., 115 F.3d 1283, 1289-90 (7th Cir. 1997); Fed. R. Civ. P. 56(c).

Qualified immunity is a doctrine which allows government officials the freedom to perform their discretionary functions without fear of potential liability for civil damages. See Harlow v. Fitzgerald, 457 U.S. 800, 816-18 (1982). Officials lose their immunity only when their conduct violates clearly established statutory or constitutional rights. See id. at 817. In our review of Dobucki's qualified immunity defense, the question is not whether Dobucki actually overstepped the boundaries of the law in his hiring decision. We must consider only whether Elwell has shown that the legal standards for the application of equal protection to the circumstances he alleges were clearly established in June of 1992 when Dobucki made the hiring decision. See Erwin v. Daley, 92 F.3d 521, 525 (7th Cir. 1996); see also Anderson v. Creighton, 483 U.S. 635 (1987) (emphasizing the need to look at the particular situation facing the defendant). Dobucki is protected by qualified immunity unless, based on such clear legal standards, a reasonable person would have known that the hiring decision would violate the Constitution. See Erwin, 92 F.3d at 525.

We begin with a look at the legal landscape in June of 1992. This is ground we largely covered in our decision in Erwin v. Daley, supra, which dealt with the similar question whether public officials of the City of Chicago were entitled to qualified immunity with respect to the City's program to increase minority representation among the ranks of officers in the Chicago Police Department. The reference year in Erwin was 1990, rather than 1992 as here, but the difference in the underlying caselaw is immaterial. In both instances, the most recent authoritative decision from the Supreme Court was City of Richmond v. Croson, 488 U.S. 469 (1989), which dealt with Richmond's program that required 30% of government subcontracts to go to minority-owned businesses. We concluded in Erwin that Croson did not clearly foreclose the use of numerical promotional goals for the promotion of minority police officers. 92 F.3d at 526. For example, only a year after Croson, in Metro Broadcasting v. FCC, the Court upheld an FCC licencing program which favored minority businesses against an Equal Protection Clause challenge, applying intermediate scrutiny to the program. 497 U.S.

547, 564-65 (1990).

This was the backdrop against which Warden Dobucki acted in 1992. He was not required to have a crystal ball that would have revealed the Supreme Court's 1995 holding in Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995), that all racial classifications, "benign" or otherwise, were subject to the strict scrutiny standard. Id. at 226. Furthermore, had he known that, he would also have known about the Court's cautionary statement in Adarand dispelling the then-commonly held notion that "strict scrutiny is strict in theory, but fatal in fact." Id. at 202. This court's 1996 decision in Wittmer v. Peters, 87 F.3d 916 (7th Cir. 1996), which upheld a policy of considering race when promoting lieutenants in a minimum security boot camp for nonviolent male offenders, demonstrates plainly that the Warden could reasonably have thought in 1992 that he was entitled to do precisely the same thing at his prison. We are certainly not prepared to say that the state of law in 1992 was clearly established in the opposite direction, when we ourselves continue to uphold some hiring decisions that take race into account. (While it is of no immediate legal relevance to this case, it is interesting to note that Wittmer was well known to the parties in this case; it was pending before the same district judge, and the plaintiffs challenging the policy that was eventually upheld were represented by the same lawyer who represents Elwell.)

A snapshot of the law in 1992, then, shows that there was no clearly established prohibition against taking race into account in a hiring decision within a prison or police department context. We are assuming for purposes of this decision that this is what Warden Dobucki did; we note as well that he denies the existence of a rigid policy requiring him to hire in-house candidates over external applicants and indeed denies that this case is properly characterized as an "affirmative action" situation at all. If there were no policy favoring internal candidates (and the Illinois DOC requirement of a state-wide posting tends to support that position), then Elwell would not have received the job in any event. If Warden Dobucki had followed the strict rank order on the list, he would have hired Crockran (African-American), Macon (African-American), and Krueger (white). What the Warden actually did was to skip over Krueger for the number four applicant, Cohan--also white, but from Graham unlike Krueger. Only a rigid policy of preferring Graham applicants would have brought the Warden far enough down the list to reach Elwell, who had the number five spot. Thus, this is the odd "affirmative action" challenge in

which the state official is accused of hiring people who were ranked as better qualified than the plaintiff, instead of dipping further down into the list for some reason and thus passing over a more highly ranked minority candidate.

But we cannot resolve the disputed fact question about the alleged preference for Graham applicants. Even if there were such a policy, we cannot find that Dobucki's action would clearly have been found to violate the Constitution. Elwell admits that Dobucki may have had operational reasons for using race as one factor in hiring lieutenants: Graham was a medium security prison with many African-American inmates. Discipline was critically important for the security and safety of the prison. Dobucki allegedly deviated from his policy of internal hiring when he chose Macon (an African-American from Centralia) for the second spot instead of skipping down to Cohan (from Graham), and then to Elwell for the third spot. Nothing in 1992 would or should have led Warden Dobucki to the conclusion that such an action would be a clear violation of Elwell's equal protection rights. He is therefore entitled to qualified immunity, and the judgment of the district court is Affirmed.