Debra **TOMASELLO**, Plaintiff,

v.

**DELTA AIR LINES, INC.**, Defendant.

No. 96 C 7289.

United States District Court,
N.D. Illinois,
Eastern Division.

June 24, 1998.

Lawrence Gordon and Paul Armstrong of Gordon & Gordon, Ltd., Chicago, IL, for Plaintiff.

Max G. Brittain, Jr. and Wendy Nutt of Brittain Sledz Morris & Slovak, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Debra Tomasello ("Tomasello") has sued her ex-employer Delta Air Lines, Inc. ("Delta"), asserting that Delta violated the Americans with Disabilities Act ("ADA," 42 U.S.C. §§ 12101–12117[1]) by discriminating against her because of her diagnosed medical condition of reflex sympathetic dystrophy. Delta has filed a Fed.R.Civ.P. ("Rule") 56 summary judgment motion, both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[2] and the motion is

---

**1.** All ADA citations will simply take the form "Section—," referring to the numbering in Title 42 rather than to ADA's internal numbering. Regulations from 29 C.F.R. are cited "Reg. § —," omitting the "29 C.F.R." preface for convenience.

**2.** GR 12(M) and (N) are designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This Opinion cites to Delta's GR 12(M) statement as "D. 12(M) ¶ —" and to Tomasello's GR 12(N) response as "T. 12(N) ¶ —." Citations to the Amended Complaint use the form "AC."

fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Delta's motion is granted and this action is dismissed.

## Summary Judgment Standards

Familiar Rule 56 principles impose on Delta the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir. 1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Tomasello was treated in a statutorily prohibited discriminatory fashion (see *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there). And as the ensuing discussion demonstrates, that standard dooms Tomasello's claims.

As with every summary judgment motion, this Court accepts nonmovant Tomasello's version of any disputed facts.[3] What follows in the *Facts* section (and to some extent later) is culled from the parties' submissions, with any differences between them resolved in Tomasello's favor.

## Facts

On September 27, 1993 Tomasello began working as a Temporary Reservations Sales Agent ("Agent")[4] in Delta's Schaumburg, Illinois Reservations Sales Office (D.12(M) ¶ 1). In that capacity she was responsible for handling telephone calls, answering questions concerning flight schedules and airfares and booking reservations (*id.* ¶ 2), all of which required her to spend the bulk of her day typing on a computer keyboard (T. 12(N) ¶ 4; Tomasello Dep. 68). Because typing is an essential function of the job, Delta required its Agents to be able to type 30 words per minute (T. 12(N) ¶ 6). But Tomasello testified that Delta did not enforce that requirement and in fact employed other unidentified persons who could not meet that number (*id.*).

On October 16, 1994 Tomasello was involved in a car accident in which she sustained multiple injuries to her face, back, breast, knee, nose and (of particular importance to this lawsuit—she is left-handed) her left arm (D.12(M) ¶ 8). As a result of that accident Tomasello was forced to take an extended leave of absence (*id.* ¶ 9). According to Delta's Director of Equal Opportunity Richard Ealey, any temporary employee is entitled to a 90–day leave of absence, after which (without exception, and irrespective of the reason for the absence) he or she must either return to the job or be terminated (Ealey Aff. ¶ 8).[5]

---

3. One important exception: Because Tomasello's factual statements and responses may be credited only if supported by corresponding record citations, this Court does not accept any unsupported statements or mischaracterizations of the record.

4. Tomasello contends that she was unaware of her temporary status, but it is undisputed that she generally worked only 20 hours per week, received less extensive medical coverage than permanent employees and was ineligible for any retirement benefits (D.12(M) ¶¶ 1, 11; Tomasello Dep. 58–59; Ealey Aff. ¶¶ 3,6). What controls here is not Tomasello's understanding but Delta's—for as the later-stated facts reflect, when Delta terminated Tomasello it applied (as it was unquestionably entitled to do) its neutral policies uniformly applicable to temporary employees.

5. Tomasello disputes "the existence and/or application of the '90-day rule'" (T. 12(N) ¶ 13). But she offers nothing by way of evidence to counter Delta's unequivocal statement (Ealey Aff. ¶¶ 7–8):

> 7. The number of Temporary employees Delta employs at any given time varies depending on the amount of work, the season, and numerous other factors. Due to these variations, a Temporary employee's term of employment expires when the work is no longer needed, or, as in Ms. Tomasello's case, when they cannot return to work within the 90 day period.
>
> 8. Under Delta's "90 day rule" a Temporary employee with an illness or injury is entitled to a leave of up to 90 days. But if that employee cannot return within 90 days, the term of his or her employment is ended and he

On January 13, 1995—the 90th day after her leave of absence began—Tomasello returned to the Schaumburg office and gave her supervisor Sharon Pendergast ("Pendergast") this January 12 doctor's diagnostic note (Tomasello Dep. Ex. 10):

> This patient has reflex sympathetic dystrophy of her L [left] hand & a fractured R [right] index finger [6] & is unable to type until further notice.

Tomasello testified that she told Pendergast that "she could type 'with the other arm' or 'take on any other position'" (D.12(m) ¶ 14, quoting Tomasello Dep. 157), but Pendergast responded that there were no other vacancies at the Schaumburg office (id.). Following that conversation Tomasello was terminated (D.12(M) ¶ 15). Six months later Delta closed its Schaumburg facility (T. 12(N) ¶ 15).

On November 9, 1995 Tomasello filed a charge of disability discrimination with Equal Employment Opportunity Commission ("EEOC"). On August 6, 1996 EEOC dismissed that charge and issued Tomasello a right-to-sue letter (AC ¶ 7 Ex. A), after which Tomasello timely filed her Complaint here.

### Positions of the Parties

Tomasello claims that Delta violated ADA by refusing to furnish her with accommodations to which she was legally entitled and then terminating her as a result of her proper request for reasonable accommodation. For its part Delta advances four contentions in support of its Rule 56 motion:

1. Tomasello's reflex sympathetic dystrophy is not a "disability" as defined for ADA purposes, so she is not entitled to relief under ADA.

2. In any event Tomasello is not a "qualified individual with a disability" and

is thus not a member of ADA's protected class.

3. Tomasello was discharged for a legitimate nondiscriminatory reason, negating an element essential to her ADA discrimination claim.

4. There was no reasonable accommodation available to enable Tomasello to continue her employment.

Because the second and third of those arguments (either singly or together) defeat Tomasello's claim, this opinion will focus on those matters (though it will speak briefly to the first—the "disability" question—as well).

### Statutory Overview

Section 12112(a) sets out ADA's general prohibition:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

ADA case law separates such disability discrimination claims into two categories:

1. claims alleging "discrimination under the specific terms of the statute" (Hunt–Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1011 (7th Cir. 1997)) by failing to make reasonable accommodations for known disabilities [7]; and

2. claims charging disparate treatment as between disabled and nondisabled employees(Sieberns v. Wal–Mart Stores, Inc., 125 F.3d 1019, 1021–22 (7th Cir.1997)).

ADA plaintiffs must be clear about the nature of the claims they assert, for as Weigel v. Target Stores, 122 F.3d 461, 464 (7th Cir.

---

or she is terminated. This policy causes the termination of all such employees. Delta has terminated many employees under these circumstances, including those who are pregnant, and those who suffer temporary medical problems such as broken bones.

For Rule 56 purposes, Delta's version stands uncontroverted.

6. After the car accident Tomasello had broken her right finger in an unrelated bathroom accident (Tomasello Dep. 32–33).

7. Under Section 12112(b)(5)(A) an employer is found to "discriminate" for ADA purposes by:

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity....

1997) (internal citations and quotation marks omitted) teaches:

> Disparate treatment claims are analyzed somewhat differently than failure to accommodate claims. In disparate treatment claims, the *McDonnell Douglas* burden-shifting framework commonly employed in Title VII and ADEA actions is generally appropriate, whereas in failure to accommodate claims the *McDonnell Douglas* framework is unnecessary and inappropriate.

Because Tomasello is not complaining that Delta treated her differently from or less favorably than non-disabled employees, she has not stated a disparate treatment claim. Instead her AC seeks to advance a direct case under the Section 12112(b)(5) definition of "discriminate"—a claim of Delta's failure to provide reasonable accommodation. So there will be no need for a *McDonnell–Douglas* ping-pong match today in any event (*id.; Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1283–84 (7th Cir.1996)).

### *Failure–To–Accommodate Claims*

█ *Best v. Shell Oil Co.*, 107 F.3d 544, 547–48 (7th Cir.1997) prescribes that to prevail ultimately on her claim, Tomasello must establish that (1) she had a "disability" within the meaning of ADA, (2) Delta was aware of that disability and (3) she was qualified for the position in question, with or without reasonable accommodations.[8] That first requirement could present a threshold question, for if a person is not "disabled" there is no need to proceed further with the inquiry (see *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995)). Even though the third requirement ultimately proves dispositive here, it is therefore worth spending a moment or two on the "disability" question (if only as a matter of background).

8. At this stage, of course, Tomasello need not "establish" or "prove" or "show" anything. Instead she has the substantially lesser burden under Rule 56 of demonstrating the existence of a genuine issue of material fact to defeat Delta's summary judgment motion. To avoid the need for cumbersome repetition of that lengthier and more awkward locution, and to be faithful in quoting the controlling case law, this opinion will frequently use the more demanding language. But of course this Court consistently adheres to and applies the lesser Rule 56 burden.

### *Reflex Sympathetic Dystrophy as a Disability*

Reg. § 1630.2(g) defines "disability" as:

> (1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (2) A record of such an impairment; or
>
> (3) Being regarded as having such an impairment.

In turn Reg. § 1630.2(h)(1) defines "physical or mental impairment" to include:

> Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine....

Tomasello seeks to invoke only the first of the Reg. § 1630.2(g) alternatives.

Although Delta does not dispute that reflex sympathetic dystrophy is an "impairment" for ADA purposes (Delta Mem. 7), it makes the valid point that not every physical impairment necessarily rises to the level of an ADA "disability" (*Roth*, 57 F.3d at 1454). As the regulatory definition states, the impairment must "substantially limit[ ] one or more of the major life activities."

█ Tomasello points to a recent judicial decision that indicates reflex sympathetic dystrophy was an ADA "disability" in the circumstances of that case (*Feliberty v. Kemper Corp.*, 98 F.3d 274, 276, 279 (7th Cir. 1996)). But no per se rule compels such a finding. Rather the determination of whether or not a person has an ADA "disability" is to be made on an individualized case-by-case basis (*Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992)).[9] As Interpretive Guidance § 1630.2(j) puts it:

9. Though *Byrne* was decided under the Rehabilitation Act of 1973, 29 U.S.C. § 794, its holding applies here as well. Interpretive Guidance on ADA Title I, Reg.App. ("Interpretive Guidance") § 1630.2(g) states:

> Congress adopted the definition of this term ["disability"] from the Rehabilitation Act definition of the term "individual with handicaps." By so doing, Congress intended that the relevant case law developed under the Rehabilitation Act be generally applicable to the term "disability" as used in the ADA.

The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors.

Such an individualized determination is necessarily fact-bound. Instead of launching into that inquiry, then,[10] this opinion will turn immediately to the dispositive question whether Tomasello—whether or not "disabled"—was a "qualified individual" when she was terminated.

### Qualified Individual

■ It will be recalled that typing was an integral part—perhaps the single most important component—of the temporary Agent job held by Tomasello. And Delta's stated policy for temporary employees requires them without exception to return not later than the expiration of their 90-day leave of absence—or to face immediate termination. Even apart from the fact that Tomasello cannot expect to have required Delta to carve out an exception for her, her attendance record even before her accident had been unsatisfactory—she had been warned on a number of occasions about her attendance and lack of dependability:

1. In March 1994 (the date of her first evaluation as an employee) Tomasello had been rated below standard in attendance, with the evaluation being that she "must show sustained improvement" in that respect (D.12(M) ¶ 7).

2. In September 1994 Tomasello was again counseled as to dependability, this time being warned "due to recent tardiness, special attention is needed to avoid arriving late for work" (id.).

3. Tomasello herself acknowledges having been counseled by her supervisor in that last respect on more than one occasion (id.).

So Tomasello was scarcely in a position to expect special treatment in contravention of Delta's firmly established policy.

To be sure, Tomasello did walk back into the Schaumburg office on the very last day of the allowed period of absence from her job. But that cannot be viewed as a *timely* return to work, for she then came armed with her doctor's letter saying that she was "unable to type until further notice." In light of that unambiguous professional opinion, on which Delta was entitled to rely,[11] Tomasello was not a "qualified individual" when she appeared on the 90th day. In view of Delta's established policy based on its personnel needs, it was entirely within its rights in treating her no differently than if she had simply called in on the 90th day to announce that she would be returning to work (say) a week later. Indeed, Tomasello's situation was even less certain from Delta's point of view, for the doctor's letter (with its reference to "until further notice") really said nothing about when Tomasello could expect to carry on the function that was so central to her job.

In an effort to escape the devastating impact of that blow to her case, Tomasello engages in two efforts at revisionist history. Neither of them survives even surface scrutiny.

---

10. There are some disparities between the description in Tomasello's Mem. 6 in connection with the current motion (where she seeks to portray "an impairment that substantially limits one's major life activities") and some aspects of her deposition testimony (e.g., Dep.49–50, 51, 149) that indicate her ability to take care of several of the normal activities of daily living. But it is at least questionable whether those disparities are sufficient to trigger the applicability of such decisions as *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996) and numerous cases cited there,

which reject current affidavits in favor of earlier sworn testimony. And given both Tomasello's entitlement to reasonable factual inferences in her favor and the fatal defect in the other vital aspect of her claim dealt with hereafter, there is no point in pursuing the "disability" analysis further.

11. In that respect, see this Court's supplementary opinion in *Biggs v. Winpak Portion Packaging, Inc.*, No. 95 C 5292, 1997 WL 457503, at *1–*2 (N.D.Ill. Aug. 7).

First, Mem. 8 says, apparently referring to Tomasello's 90th day appearance (but without giving any record citation):

> Plaintiff further indicated when her doctor indicated that she could not type, that meant only with her left hand, not her right hand.

But this Court has examined all of the evidence (including Tomasello's deposition) with care. There is nothing there to support her (or her lawyer's) characterization that so flies in the face of the doctor's unequivocal statement of Tomasello's inability to type at all, made after he had identified current problems with *each* hand.

Second, Tomasello tendered an affidavit as part of her response to Delta's Rule 56 motion that said (Aff.¶ 2):

> That on or about January 13, 1995, your Affiant was able to type in excess of thirty words per minute at the time she returned to work by using her right hand only.

For one thing, that October 1997 affidavit statement is wholly at odds with Tomasello's May 1997 deposition testimony.[12] But even if it were not, Delta was more than entitled to credit and to rely on the doctor's statement in applying its uniform and neutral 90–days–or–out policy as to temporary employees.

To put the matter in statutory terms, even if the condition of Tomasello's left hand at that time were viewed as an ADA "disability," she still was not, as ADA also requires, a "qualified individual"—because on the basis of what was before Delta at the time it made its decision, Tomasello was then "unable to type until further notice." Even from Tomasello's best-case scenario, then, the analysis compels the identical conclusion that was reached in *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 564 (7th Cir.1996)(adapted to this case):

> Because [Tomasello] has failed to adduce sufficient evidence to show that [s]he was a "qualified individual with a disability," [s]he was not entitled to the reasonable accommodations [s]he requested, nor was [s]he protected from being discharged because of [her] disability.

And as further taught by *Bombard, id.* at 563, that status was to be determined "as of the time of the employment decision."

*Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 484 (7th Cir.1997) teaches that "the burden of proof on the issue of capability is not on the employer but on the plaintiff." As stated in n. 8, Tomasello's burden in the present context is the lesser one of demonstrating the existence of a genuine issue of material fact on that score. But even with the benefit of the reasonable favorable inferences that are called for by Rule 56, Tomasello strikes out. Quite apart from the already-identified problem of her affidavit's inconsistency with her earlier deposition testimony, this Court is *not* required to accept her untenable distortion of the doctor's note.

### Conclusion

As stated earlier, it is unnecessary for present purposes to determine whether or not Tomasello suffered from a "disability" at the time of her termination. Instead, there is no genuine issue of material fact as to whether Tomasello was then a "qualified individual" (she clearly was not), and Delta is therefore entitled to a judgment as a matter of law. This action is dismissed.

---

**12.** In her deposition Tomasello had testified that she then had *no idea* how many words a minute she could type with her right hand (Dep.51) and that she had attempted to type only *after* January 19, 1995, hence *after* her termination (Dep.50). Those contradictions would call for the rejection of her later affidavit under the line of cases exemplified by *Bank of Ill.* (see n. 10).