Johnnie MITCHELL, Plaintiff,

v.

Lonnie RANDOLPH, as Judge of the East Chicago City Court and individually, and City of East Chicago, Defendants.

City of East Chicago, Cross–Plaintiff,

v.

Lonnie Randolph, Cross–Defendant.

No. 2:98CV0484AS.

United States District Court,
N.D. Indiana,
Hammond Division.

July 27, 2001.

James B. Meyer, W. Anthony Walker, Lukas I. Cohen, Meyer & Wyatt PC, Gary, IN, for Johnnie Mitchell.

Harold Abrahamson, Kenneth D. Reed, Abrahamson, Reed and Adley, Hammond, IN, Wayne E. Uhl, Anthony W. Overholt, Indiana Attorney General, Indianapolis, IN, for Lonnie Randolph.

Terrance L. Smith, Anthony DeBonis, Jr., David S. Gladish, Smith and Debonis, Highland, IN, for City of Chicago.

Kristina C. Kantar, Merrillville, IN, for Bobby Cantrell.

James L. Wieser, Wieser and Sterba, Schererville, IN, for Stephen R. Stiglich.

### MEMORANDUM AND ORDER

SHARP, District Judge.

This matter is before the court on the Defendants', Lonnie Randolph and City of East Chicago, separately filed motions for summary judgment pursuant to FED. R. CIV. P. 56. For the following reasons the Court **GRANTS** in part and **DENIES** in part.[1]

## I. BACKGROUND

Prior to her alleged constructive discharge, Johnnie Mitchell had a twenty-five year career with the City of East Chicago. As will become important later, for much of that time, she had been a political supporter of Mayor Robert A. Pastrick. From 1973 to 1998, she worked as court coordinator for a judge of the East Chicago City Court, Judge Del Marie Williams. However, in July of 1998 Lonnie Randolph ("Judge Randolph") was appointed by the Governor to fill the position as a result of Judge Williams' death. Shortly thereafter, Judge Randolph, a political foe of Mayor Pastrick, demoted Mitchell to part-time status.

Not surprisingly, the long standing nature of political acrimony between these two parties is dependent upon whose side of the story one wishes to believe. According to Ms. Mitchell she served on the campaign of Judge Randolph's opponent during his (Judge Randolph) two unsuccessful runs for mayor of the City of East Chicago. Furthermore, Ms. Mitchell was also an opponent of Judge Randolph during their run for a seat on the East Chicago City Council in 1987. (Mitchell Dep. p. 199). However, Judge Randolph stated repeatedly during his deposition testimony that he was not aware of Ms. Mitchell's political involvement. (Randolph Dep. p. 272). Furthermore he testified that he did not recall that Ms Mitchell ran against him as a candidate for City Council. (Id.).

During some point prior to being sworn, Judge Randolph met individually with each court employee to determine their roles and duties, including Ms. Mitchell. (De-

---

1. Oral argument was held on July 19, 2001 in Hammond, Indiana.

fendant's Statement of Material Facts at ¶ 7). No written job description existed detailing the various duties of her position as court coordinator. (Mitchell Dep. 42–43). In fact Judge Randolph readily admits that he did not have a firm idea of Mitchell's duties. (D's Stat. Mat. Facts at ¶ 11). According to Mitchell's deposition testimony, her duties included the following: 1) answering the phones; 2) processing warrants; 3) filing; 4) contacting social service agencies for inmates; and 5) scheduling mock courts along with the court administrator and judge. (Mitchell Dep. p. 30–39). Furthermore her testimony reflects that her duties also included working with government agencies to provide food and housing to low income members of the community. (Mitchell Dep. 30, 48).

During the interview, Ms. Mitchell raised the issue of her political affiliation with Judge Randolph. However, Judge Randolph abruptly stopped her and told her that politics would not play a role in his staffing decisions. Subsequently, Judge Randolph decided to restructure Mitchell's duties. A new position entitled "community coordinator" was created to handle all interactions between the court and the community, as well as the sentencing programs. Judge Randolph hired Charlene Mahone to fill this role. Apparently Judge Randolph had contacted Ms. Mahone some time after he was told that he would be appointed but before he had decided to reduce Mitchell to part-time status. (Decl. Mahone at ¶ 3).

Thereafter, Judge Randolph informed Mitchell that she would retain the remaining duties of her former position, but only on a part-time status. (D's Stat. Mat. Facts at ¶ 25). On August 10, 1998, three days after Judge Randolph was sworn in, Mitchell's status was changed from full-time employment to part-time employment. Ms. Mitchell informed Judge Randolph by letter that placing her on part-time status would result in a significant hardship due to the loss in benefits. (D's Stat. Mat. Facts at ¶ 28). Judge Randolph did not respond to this letter. Subsequently, Ms. Mitchell submitted her resignation to the City of East Chicago. Mitchell then filed suit in federal court alleging a violation of First Amendment rights.

Finally, counsel for Mitchell makes certain factual assertions which bare little relevance to her § 1983 claim. Specifically, Mitchell contends that Judge Randolph is under investigation by the Federal Bureau of Investigations for possible ghost employment. Any allegations that employees later hired to perform Mitchell's duties were working other jobs and being paid by the City of East Chicago have no relevance whatsoever to her alleged constructive discharge because of her political affiliation. Therefore the Plaintiff's statement of facts with respect to those allegations are now stricken.

The court now turns to the City of East Chicago's ("City of East Chicago" or "City") involvement in this case as a named Defendant. Mitchell testified during her deposition that the City of East Chicago has not done anything to harm her but Judge Lonnie Randolph did. (Mitchell Dep. p. 86). She testified that no application of any policy, procedure, custom or practice, or knowledge of the City of East Chicago is the cause of her complaints in this case. Rather it is her testimony that Judge Randolph's sole discretionary decision to restructure his court personnel is the gravamen of her complaint. (Mitchell Dep. p. 173–174). Furthermore, Judge Randolph testified that no one from the City of East Chicago had played any part in his decision to hire or fire any court personnel on his staff. (Randolph Deposition at p. 63, 105, 110)

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c) *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mitchell must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mitchell must present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e) and only if a reasonable jury could render a verdict for Mitchell does she defeat summary judgment. *Jordan v. Summers* 205 F.3d 337, 342 (7th Cir.2000). *See Also Vanasco v. National Louis Univ.,* 137 F.3d 962, 965 (7th Cir.1998).

In determining whether summary judgment is appropriate, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Liberty Lobby Inc., supra,* at 254, 106 S.Ct. 2505. This general standard is applied with added rigor in employment cases, where intent is inevitably the central issue. *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793 (7th Cir.1995); *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368 (7th Cir.1992); *Tomasello v. Delta Air Lines, Inc.,* 8 F.Supp.2d 1090 (N.D.Ill.1998).

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in her favor. *Schneiker v. Fortis Insurance Co.,* 200 F.3d 1055 (7th Cir.2000); *Baron v. City of Highland Park,* 195 F.3d 333, 337–38 (7th Cir.1999). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Wollin v. Gondert,* 192 F.3d 616, 621–22 (7th Cir. 1999); *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir.1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 *Shank v. William R. Hague, Inc.,* 192 F.3d 675, 681 (7th Cir. 1999); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997).

## III. DISCUSSION

The problems with the corrupting influences of political patronage in public service positions are long standing and well documented throughout our history as a nation. In fact our third president, Thomas Jefferson, was so concerned about the politicization of public servants and the effect on their efficiency and neutrality he issued an executive order that officers of the federal government could not attempt "to influence the votes of others nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it." See W.C. Rives, A Speech to the United States Senate on a Bill To Prevent the Interference of Certain Federal Officers in Elections, Cong. Globe, 25th Cong., 3rd Sess. 407 (1839), reprinted in 8 James D. Richardson, A Compilation of the Messages and Papers of the Presidents, 1789–1897, at 98 –99 (1898). Later, these concerns culminated in the passage of the Hatch Act in 1939 and although this act was later amended which lifted many of the restrictions; it highlights the concerns of politicizing public servant positions.

Legal commentators have suggested various justifications for politically motivated dismissals over the years. See Rafael Gely and Timothy Chandler, Restricting Public Employees' Political Activities: Good Government or Partisan Politics?, 37 Houston Law Review 775 Fall 2000 at 797 (and citations therein). Those justifications include loyalty of their employees, preservation of the democratic process, quasi welfare functions and as an instrument of social acceptance of minorities. Id. at 797. However, the Supreme Court in more recent opinions rejected some of the justifications in promoting the practices of patronage.

For example, in *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); the Court stated that:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.'

Later, the Court applied the above edict to the context of political association and patronage in determining to what extent a public employee could be dismissed based upon her right to associate with a particular political party under the First Amendment. See *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

## A. EXCEPTIONS UNDER *ELROD & BRANTI*

As noted by the Seventh Circuit in *Tarpley v. Keistler*, 188 F.3d 788, 789 (7th Cir.1999) and *Americanos v. Carter*, 74 F.3d 138, 140 (7th Cir.1996), the use of party affiliation generally cannot be used as a criterion for public employment unless the job involves some policy-making or confidentiality component. See also *Rutan*, 497 U.S. at 74–76, 110 S.Ct. 2729. As outlined by these cases the relevant inquiry is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti* at 518, 100 S.Ct. 1287.

Apparently, history is doomed to repeat itself when dealing with the tumultous goings on of Lake County Democratic party politics. Some fifteen years ago then District Court Judge Kanne was presented with a similar claim involving certain bailiffs that were terminated because of their party affiliation. See *Meeks v. Grimes*, 779 F.2d 417 (7th Cir.1985).[2] The standard employed by the Seventh Circuit in that case was the same enunciated under *Branti*. However, the Seventh Circuit expanded upon what considerations must be followed in employing that standard. Specifically, that a district court should focus on the office or position in question rather than on the individual officeholders. *Meeks*, 779 F.2d at 419. See also *Nekolny*

---

**2.** Interestingly, the court of appeals decision does not reflect that a qualified immunity defense was raised by the defendant judge at the district court level.

*v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981).

In *Meeks*, the various plaintiffs consisted of bailiffs in the Gary City Court. 779 F.2d at 417–418. Apparently, they had strongly supported the losing candidate for judge of that court. *Id.* The election was hard fought and generated considerable ill-will between the parties. *Id.* Upon being sworn, the defendant judge discharged the plaintiffs from their positions as bailiffs. *Id.* A bench trial was held and testimony was presented on substantially similar issues presented by the parties in this case.

Judge Kanne found that the plaintiffs were discharged based upon their political ties, however, the decision to terminate them based upon their political leanings was justified. *Id.* That finding was based upon the following: 1) the bailiffs are viewed as the judge's representatives in public and thus must have the complete confidence of the judge; 2) the bailiff's access to confidential communications and records; and 3) the difficult working condition engendered by the natural animosity resulting out of political opposition. *Id.*

The Seventh Circuit noted that while an initial focus should be on the inherent powers of an office. *Meeks*, 779 F.2d at 420 n. 2 "It is impossible to generalize about the nature of an individual type of position." *Id.* Positions within a government unit such as a bailiff or a secretary can vary greatly. *Id.* The Seventh Circuit stated that "[f]or this reason the test under *Branti* must be applied to each individual office, and status under that formulation is left to the trier of fact to be determined." *Meeks*, 779 F.2d at 420–21 n. 2 See Also *Soderbeck v. Burnett County*, 752 F.2d 285, 288 (7th Cir.1985); *Nekolny v. Painter*, 653 F.2d 1164, 1169–70 (7th Cir.1981) cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Elrod*, 427 U.S. at 367–68, 96 S.Ct. 2673.

The Seventh Circuit agreed with Judge Kanne that the duties of a bailiff which mainly included process serving and courtroom security did not qualify as a policymaking position. *Meeks*, 779 F.2d at 420. The court of appeals specifically noted that, "these are duties that are classically ministerial as opposed to discretionary." *Id.* The Seventh Circuit went on to identify various positions in which it considered to qualify as policy making in nature.

More importantly the court of appeals, in discussing whether the confidential nature of a position can be considered as a criterion upon which First Amendment considerations must be put to one side, noted that: "the individual chambers constitute cells within an organization where relationships must be based on loyalty and rapport because of the constant face to face contact resulting from the more intimate surroundings." *Id.* at 423. Furthermore, then Circuit Judge Flaum found that "It would strain credulity to read the First Amendment or *Elrod* to require an elected official to work in constant direct contact with a person viewed as a political enemy." *Id.* at 423. The Seventh Circuit limited its holding to only those employees who work in direct and constant contact with a political official employer in its stated exemption from the First Amendment's protection involving patronage dismissals. *Id.* "With respect to a judge's chambers this might refer only to the judge's secretary, the law clerks, and, possibly, a court reporter or bailiff assigned exclusively to the judge." *Id.* The Seventh Circuit reversed and remanded the lower court's ruling based on the following considerations: 1) the bailiffs were not an integral part of the daily routine in the Judge's chambers; 2) the fact that the bailiffs were not affiliated with the judge's chambers but were rather performing ministerial tasks on the part of a larger organization that being the Gary City Court. On re-

mand the Court emphasized that the district court must focus on the closeness or intimacy and the confidentiality of the relationship between each specific bailiff position in relation to the judge. *Id.* at 424.

More recently the Seventh Circuit in *Milazzo v. O'Connell*, 108 F.3d 129 (7th Cir.1997) and 151 F.3d 587 (7th Cir.1998) revisited these same issues concerning the discharge of court personnel by a judge. In *(Milazzo I)*, the various defendants, which included the chief judge of the Cook County Circuit Court, appealed the district court's denial of their motion to dismiss. In affirming the district court's decision the Seventh Circuit noted that it was the defendants burden to establish that the plaintiff's position fell within an exception under the relevant analysis of both *Elrod* and *Branti*. *Milazzo*, 108 F.3d at 132. The court of appeals went on to find that she had no autonomous or discretionary authority, the ability to formulate policy or an intimate working relationship with the Chief Judge. *Id.* Further, the plaintiff was supervised closely and was required to have her correspondence approved by the defendants. *Id.* The court of appeals noted that her position did, however, involve frequent contact with the Chief Judge as the Human Resources Administrator. *Id.* at 131.

In *(Milazzo II)*, the Seventh Circuit again revisited the plaintiff's claims after the district court granted summary judgment in favor of the defendants. 151 F.3d at 590. At the summary judgment level the district court determined that political affiliation was an appropriate consideration for the Human Resources Administrator position. *Id.* The district court placed significant reliance upon the fact that the occupant of the current position exercised broad discretionary authority. *Id.*

The Seventh Circuit disagreed with the district court's reasoning that because the undisputed facts revealed that the "[a]d-ministrator position has [now] inherent policy making potential and that political affiliation is a reasonable requirement of that position, so that plaintiff's job termination did not violate the Constitution." *Id.* at 591. It noted that the proper inquiry was whether her termination from the position as it was in July 1995 was improper. *Id.* Further it found that "If it [the jury] finds that political affiliation was not a necessary requirement for the Human Resources Administrator or that defendants added responsibility to that position requiring affiliation only after this suit was filed recovery would be warranted." *Id.* In his concurring opinion, Circuit Judge Cudahy noted that issues of material fact remained with respect to whether political affiliation is an appropriate criterion for the position of Human Resources Administrator. *Id.* at 591. The court now turns to the application of these principles to the particular facts in this case. Bearing in mind that at this stage all facts must be viewed in the light most favorable to Mitchell. See FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 550–555, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).

Ms. Mitchell's duties included: 1) answering the phones; 2) processing warrants, filing; 3) contacting social service agencies for inmates and scheduling mock courts along with the court administrator and judge. These tasks hardly qualify as the type of policy-making duties that would require her to have the same political leanings as Judge Randolph. Furthermore, Ms. Mitchell does not contest in her response to Judge Randolph's motion for summary judgment that her former position involved contact with outside agencies on behalf of the judge. What is unclear from the factual record is whether her so-called social functions as well as her interaction with community agencies and business as part of the sentencing function constitutes a policy making position or con-

fidential position. There is no evidence currently before the court that Mitchell had wide discretion or autonomy in performing these duties. More importantly, there is no evidence before the court concerning the closeness and intimacy of Mitchell's former position in relation to the judge. See *Meeks,* 779 F.2d at 424. Rather in viewing the facts in a light most favorable to her claims, as the court is obligated to do, a jury could conclude that she merely performed ministerial duties for the court.

■ Judge Randolph alleges that he has reorganized Mitchell's former position to enhance its performance in the area of probation programs, a duty that formerly belonged to Mitchell. (See Randolph Decl. at ¶ 8). As part of these newly created duties, Ms. Mahone works with the Probation Department to enhance services for alcohol and drug offenders, finds community service opportunities as a sentencing alternative, and in essence acts as a personal liaison between the Judge and various government agencies, quasi-government agencies and businesses. However, these facts fall under the relevant inquiry into whether her termination was a politically motivated attack against Mitchell. It is worth repeating that the recent decision in *Milazzo* teaches the inquiry that must be made is whether the constructive termination from the position as it was in August of 1998 improper. Finally, Judge Randolph bears the burden of establishing that Mitchell's position falls within the exception for certain policy-making or confidential positions. *Milazzo,* 108 F.3d at 132. Therefore, a fact question remains as to whether political affiliation was an appropriate criterion for Mitchell's position as it existed on the date of her alleged constructive discharge.

## B. QUALIFIED IMMUNITY

■ Qualified immunity shields government officials who are performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The protection afforded through qualified immunity "turns on the 'objective legal reasonableness' of the action, *Harlow,* 457 U.S., at 819, 102 S.Ct. 2727, assessed in light of the legal rules that were 'clearly established' at the time it was taken, *Id.,* at 818, 102 S.Ct. 2727." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

■ As stated in *Anderson:*

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ...; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. *Id.* at 640, 107 S.Ct. 3034.

A plaintiff may show that a legal rule was "clearly established" by either providing a "closely analogous" case covering both the right at issue and its application to the facts of the case at hand or showing that a reasonable person would have known that they were violating the law because such violation was so obvious. See *Erwin v. Daley,* 92 F.3d 521, 525 (7th Cir.1996); *Kernats v. O'Sullivan,* 35 F.3d 1171, 1177 (7th Cir.1994); *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992); *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), certiorari denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534.

In *Ruffino v. Sheahan*, 218 F.3d 697, 701 (7th Cir.2000) the court of appeals agreed that resolution of whether qualified immunity applied to an office holders must await when material facts are in dispute. In *Ruffino*, the sheriff claimed that he was dismissing various deputies based upon a corruption probe and their certifications. *Id.* at 698–699 Alternatively, the deputies claimed that their dismissal was based upon the political affiliation. *Id.* at 698. The court of appeals stated, "Nothing but fact-finding will resolve this point, . . ." *Id.* at 701. Again, the facts must bear out that Mitchell's position fits squarely with the exception created in *Elrod* and *Branti* before a qualified immunity will bar recovery. *Milazzo*, 108 F.3d at 132–33. See Also *Flenner v. Sheahan*, 107 F.3d 459, 465 (7th Cir.1997)(Once the factual record is developed the district court may be required to revisit the qualified immunity issue.) Therefore, once the factual record is more fully developed a special verdict under Fed.R.Civ.P. 49 or judgment as a matter of law under Fed.R.Civ. P. 50 may be appropriate.

## C. RETALIATION BASED UPON MITCHELL'S POLITICAL AFFILIATION

If it is determined that Ms. Mitchell's position qualifies as a non policy making position which cannot be terminated based upon the impermissible consideration of her political affiliation, the question then becomes whether Judge Randolph removed her from full time status based upon that purpose.

■ Under the relevant analysis in *Mt. Healthy City Sch. Dist. Bd.. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Mitchell must demonstrate that her political affiliation or lack thereof to Judge Randolph's camp was a substantial or motivating factor in his restructuring of Mitchell's position. See

*Krecioch v. United States*, 221 F.3d 976 (7th Cir.2000), cert. denied, 531 U.S. 1026, 121 S.Ct. 599, 148 L.Ed.2d 512 (2000);*Thomsen v. Romeis*, 198 F.3d 1022, 1027 (7th Cir.2000). The analysis at this stage requires a two step approach. First the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in the discharge. *Mt. Healthy City School Dist. Bd. of Ed.*, 429 U.S. at 287, 97 S.Ct. 568. Second, if the employee can prove such, the burden will then shift to the employer to put forward evidence that it would have taken the adverse employment action against the employee even in the absence of the protected speech. *Mt. Healthy City School Dist. Bd. of Ed.* at 287, 97 S.Ct. 568; *Thomsen*, 198 F.3d at 1028; (A plaintiff cannot prevail on a retaliatory discharge claim if the decision to terminate him would have been reasonable even in the absence of the protected conduct). The Seventh Circuit has made it abundtly clear that "even if a defendant was 'brimming over with unconstitutional wrath' against the plaintiff, a § 1983 plaintiff cannot prevail unless he or she can establish that the challenged action would not have occurred 'but for' the constitutionally protected conduct." *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 482 (7th Cir.1995) citing *Button v. Harden*, 814 F.2d 382, 383 (7th Cir.1987).

■ For purposes of a retaliation claim the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim. *Johnson* 70 F.3d at 482; *compare Klein v. Trustees of Indiana*, 766 F.2d 275, 280 (7th Cir.1985) (Title VII) with *Button*, 814 F.2d at 383 (§ 1983). Once the defendant has offered a legitimate reason for termination, the plaintiff's rebuttal evidence must focus on the defendant's specific reasons for tak-

ing the challenged employment action. *Klein*, 766 F.2d at 280; *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1414 (7th Cir.1984). "To establish that a discriminatory reason more likely motivated the employer in taking the challenged action, the plaintiff must present evidence sufficiently substantial to show that, in addition to the defendant's proffered reasons, a discriminatory motive was a determining factor." *La Montagne*, 750 F.2d at 1414.

 Judge Randolph contends that Mitchell has failed to even make out a prima facie case that she was discriminated against based upon her political affiliation. Judge Randolph contends there exists no evidence as to his knowledge of Mitchell's political leanings and that he abruptly cut her off when she raised the topic. However, in viewing the facts as alleged in a light most favorable to Mitchell a reasonable trier of fact might find otherwise. See *Meeks v. Grimes*, supra, 779 F.2d at 418. (the Seventh Circuit found no reason to disturb the trial judge's factual determination that the dismissal was politically motivated. This determination was made on the following: the credibility of the testimony heard at the trial coupled with the strong circumstantial inference arising from the close temporal proximity of the defendant's assumption of office and the dismissals.)

What is certain is that Mitchell was a long-time supporter of Judge Randolph's political adversary for mayor, Robert Pastrick. Secondly, Mitchell ran against Randolph for the City Council in 1987. Thirdly, the close temporal proximity involving the judge's appointment, his contact with Ms. Mahon, and Mitchell's dismissal raises a circumstantial inference that political motivations may have played a role in his decision to reduce Mitchell's status to part-time.

Furthermore, neither side has sufficiently developed the facts with respect to the exact nature of the new position. Specifically, the court of appeals found that if Judge Randolph began to use this new position for executive or politically motivated tasks, a stronger inference of retaliation might lie. *Mitchell*, 215 F.3d at 757. Although, Judge Randolph admitted that Ms. Mahone's efforts would have had an impact upon his ability to run a successful political campaign. (Randolph Decl. at ¶ 13). It is uncertain whether this means that her tasks included politically motivated tasks or not. Therefore, in viewing the facts in a light favorable to Mitchell a reasonable jury could infer from the various circumstantial evidence that she was constructively discharged based upon her political leanings.

### D. CITY OF EAST CHICAGO'S LIABILITY UNDER *MONELL*

Finally, the court addresses Mitchell's contention that Judge Randolph as a judge for a municipal court in the City of East Chicago is considered a high-level policy maker and thus, the City is liable for Judge Randolph's alleged unconstitutional conduct. The Supreme Court in *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), concluded that a municipality could be liable for the violation of an employee's constitutional rights under certain limited circumstances. Here Mitchell contends that Judge Randolph's alleged decision to reduce her status to part-time based upon her protected rights was deemed to reflect the City's official policy. Thus implying that the City has adopted or ratified his policy of allegedly violating a city employee's First Amendment right.

The Supreme Court in *Pembaur v. Cincinnati*, 475 U.S. 469, 478–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), determined

that when the actor responsible for the deprivation of rights is so highly placed in the city his or her actions may be deemed to embody the official policy of the city. The City of East Chicago points to the Seventh Circuit's decision in *Venters v. City of Delphi*, 123 F.3d 956, 966 (7th Cir.1997) to demonstrate that Judge Randolph's position as a judge for the City did not render him a policy-maker under *Monell, Pembaur* and other similarly decided cases. In *Venters*, the Seventh Circuit focused its inquiry on state law to determine whether a Chief of Police possessed policy making authority for the city. The court of appeals found that no Indiana law or any other evidence presented by the plaintiff led it to the conclusion that the chief either retained or had been delegated by the policy-making officials of the city any power to establish official policy on behalf of the city.

■■■ The Indiana Constitution in mirroring the Federal Constitution has separated the powers of the judiciary from the other two branches of government, namely the executive and legislative. See IND. CONST. art. III, § 1. Furthermore, the authority for cities similar to the City of East Chicago to create municipal courts derives from statutory law.[3] Judges appointed under this statute are under the obligation to register with the Division of State Court Administration of the Indiana Office of Judicial Administration under Ind.Code § 33–2.1–7. Municipal judges, like other state court judges, have the statutory authority to appoint, compensate and supervise court personnel. These judges have the inherent power to determine their staffing needs and to make decisions with respect to what personnel arrangement will promote an efficient means to performing their judicial functions. *State ex rel. Hovey v. Noble*, 118 Ind. 350, 21 N.E. 244 (1889), *Schiralli v. Lake County Council*, 504 N.E.2d 1020 (Ind.1987). Mitchell has not directed this court to any Indiana statutory or case law which would suggest that municipal judges are considered policy makers for the cities in which they sit. Rather, this would be counter-intuitive to the Constitutional and statutory makeup of the State of Indiana.

Furthermore, the City of East Chicago directs the court to the Indiana Supreme Court's decision in *Carlson v. State ex rel. Stodola*, 247 Ind. 631, 220 N.E.2d 532 (1966). In *Carlson*, Indiana's highest court determined that the common council

---

**3.** The municipal court in which Judge Randolph presides was created under Indiana statute pursuant to Ind.Code § 33–10.1–1–4 and must give notice of its action to the division of state court administration of the office of judicial administration under Ind. Code § 33–2.1–7. These courts have jurisdiction over all violations of the ordinances, misdemeanors and infractions of the city. See Ind.Code § 33–10.1–2–2. Additionally, the municipal courts have concurrent jurisdiction over civil cases when the amount in controversy is over $3,000. See Ind.Code § 33–10.1–2–4. Once a city court is created, judges are elected by the voters of the city or town every four years. See Ind.Code § 33–10.1–3–1.1. These judges are compensated similarly to that allowed special judges in the circuit court. See Ind.Code § 33–10.1–4–2. Article Six, Chapter Five of the Indiana Code dealing with City and Town Courts does not specifically address what other personnel a city court judge may appoint outside of a courtroom bailiff.

Indiana Statutory law grants judges the authority to appoint personnel commensurate with their various needs. See Ind.Code § 33.–2.1–2–7 (The Court of Appeals may appoint such personnel as the court determines to be necessary.) See Ind.Code § 33.–10.5–8–2(b) (The judge of the county court shall appoint a bailiff and a reporter and such other employees as are necessary to carry out the business of the court.) See Ind.Code § 33–1–12–5 (the judges of the courts sitting in committee may appoint additional personnel in sufficient number so that they may be adequately served by the court administrator.)

of a city may not interfere with the functioning of a city court in the exercise of its budgetary power with respect to personnel and other matters. *Id.* at 536.

The facts in this case bear out that decision reached by the Indiana Supreme Court in *Carlson.* Mitchell testified during her deposition that the City of East Chicago has not done anything to harm her but Judge Lonnie Randolph did. (Mitchell Dep. p. 86). She testified that no application of any policy, procedure, custom or practice, or knowledge of the City of East Chicago is the cause of her complaints in this case. Her sole focus, rather is on Judge Randolph's decision to reduce her to part-time. (Mitchell Dep. p. 173–174). Finally, Judge Randolph testified that no one from the City of East Chicago had played any part in his decision to hire or fire any court personnel on his staff. (Randolph Deposition at p. 63, 105, 110). Therefore, the City of East Chicago's motion for summary judgment is **GRANTED**. The City of East Chicago's cross-motion for summary judgment against Judge Randolph is **DENIED** as moot.

### IV. CONCLUSION

For the foregoing reasons the Defendant's, Lonnie Randolph, motion for summary judgment is **DENIED**. The Defendant's, City of East Chicago, motion for summary judgment is **GRANTED**. The Defendant's, Lonnie Randolph, motion to strike is **GRANTED** in part. **IT IS SO ORDERED**.